UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CANDACE FALLER,<br><br>              Plaintiff,<br><br>v.<br><br>TWO BRIDGES REGIONAL JAIL,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)  Docket no. 2:21-cv-00063-GZS<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Motion for Summary Judgment by Defendant Two Bridges Regional Jail (ECF No. 36). Having considered the Motion and the related filings (ECF Nos. 26–31, 33–34, 37 & 40–44), the Court DENIES the Motion (ECF No. 36) for the reasons stated herein.

**I.    LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy

issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (cleaned up); see also Fed. R. Civ. P. 56(e).  "That evidence, however, cannot 'rely on improbable inferences, conclusory allegations, or rank speculation.'" Snell v. Neville, 998 F.3d 474, 486 (1st Cir. 2021) (quoting Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008) (cleaned up)).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party."  In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993). "However, summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." Morales-Melecio v. United States (Dep't of Health and Hum. Servs.), 890 F.3d 361, 368 (1st Cir. 2018) (cleaned up).  "When determining if a genuine dispute of material fact exists, [courts] look to all of the record materials on file, including the pleadings, depositions, and affidavits without evaluating the credibility of witnesses or weighing the evidence." Taite, 999 F.3d at 93 (cleaned up).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b).  This local rule further requires each statement of material fact to be "followed by a citation to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f).  A party opposing a motion for summary judgment must then file an opposing statement in which it admits, denies, or qualifies the moving party's statements, with citations to supporting evidence, and in which it may set forth additional facts, again with citations to supporting evidence. D. Me. Loc. R. 56(c).  Ultimately, in constructing the narrative of undisputed facts for purposes of summary judgment, the Court "may disregard any statement of fact not supported by a specific citation to record material properly considered on

summary judgment." D. Me. Loc. R. 56(f). In accordance with these standards, the Court recounts the relevant facts in the following section.

## II. BACKGROUND[1]

On April 28, 2016, at approximately 8:00 AM, Plaintiff Candace Faller[2] was pulled over by a Wiscasset police officer who witnessed her driving erratically. (See Joint Statement of Material Facts (ECF No. 26) ("JSMF"), PageID #s 99 & 104.) After failing to pass field sobriety tests, Faller was placed in handcuffs and taken to Two Bridges Regional Jail ("TBRJ"), a correctional facility operated by the Sagadahoc Multicounty Jail Authority ("SMJA"). (See id.) She was charged with operating under the influence.

### A. Pat Searches at Two Bridges Regional Jail

At the time of Faller's admission in April 2016, TBRJ policy required each new admittee to undergo a pat search of her person, which required the admittee to stand with her hands against the wall and her feet shoulder width apart. (See id., PageID #s 100 & 104; Joint Ex. 6 (ECF No. 27-6), PageID #s 145 & 146.) The pat search ensured that the admittee did not retain any item that might pose a threat to the admittee herself or to others present in the facility, including staff, and was typically performed by an officer of the same sex as the admittee. (Rubashkin Aff. (ECF No. 37-1), PageID #s 874–75; Bonang Dep. (ECF No. 29), PageID #s 341–42; JSMF, PageID # 100.) A pat search of each new admittee was a prerequisite to the individual being left alone in any area of the jail. (Rubashkin Aff., PageID # 874; Bonang Dep., PageID # 352.)

---

[1] The Court notes that Plaintiff has asked the Court to strike many of Defendant's statements of material fact. See Pl. Statement of Material Facts (ECF No. 41) ("Pl. SMF"), PageID #s 909–14. The Court finds it unnecessary to address each of these requests individually. Rather, the Court has reviewed all of the cited exhibits and has disregarded any statement of fact that is not properly supported by admissible evidence in the record currently before the Court, as it is obliged to do. See D. Me. Loc. R. 56(f).

[2] At this time, Faller weighed 110 pounds and stood 61 inches tall. See Joint Statement of Material Facts (ECF No. 26) ("JSMF"), PageID # 104.

3

Ordinarily, TBRJ officers would begin the booking process, commencing with a pat search, when the arresting officer completed her required paperwork. (Rubashkin Dep. (ECF No. 30), PageID # 489; see Joint Ex. 6, PageID #s 145 & 146.) In some unspecified circumstances, an admittee would be permitted to wait with the arresting officer until the officer assigned to conduct the pat search was available. (See Bonang Dep., PageID #s 435–36; Pl. Statement of Material Facts (ECF No. 41) ("Pl. SMF"), PageID # 920; Def. Reply Statement of Material Facts (ECF No. 44) ("Def. Reply SMF"), PageID # 1037.)

Under TBRJ policy then in force, both cooperative and uncooperative admittees would generally undergo the required pat search in the sallyport adjacent to the intoxilyzer room. (Joint Ex. 6, PageID #s 145 & 146; Pl. SMF, PageID # 907.) Then, uncooperative admittees would sometimes be escorted to a secure holding cell. (Bonang Dep., PageID # 340; Pl. SMF, PageID # 915.) TBRJ policy also allowed for uncooperative inmates to be searched in a location other than the sallyport, including a secure holding cell. (See Bonang Dep., PageID # 340; Rubashkin Dep., PageID # 499.) A cooperative inmate could proceed through the booking process without being touched by an officer of the opposite sex. (Rubashkin Dep., PageID # 552; Bonang Dep., PageID # 378.)

    **B.**  **Candace Faller's April 2016 Experience at Two Bridges Regional Jail**

The officer who arrested Faller and brought her to TBRJ in April 2016 was female. (Faller Dep. (ECF No. 28), PageID # 231; Pl. SMF, PageID # 916; Def. Reply SMF, PageID # 1033.) Upon arrival at TBRJ, the arresting officer took Faller to the facility's intoxilyzer room prior to beginning the booking process. (Faller Dep., PageID # 236.) While in the intoxilyzer room, Faller informed TBRJ Officer Paul Rubashkin that she "suffered from posttraumatic stress from a rape" and that she "[could] not handle an aggressive man touching" her. (Id., PageID #s 238–39; see

4

JSMF, PageID # 100.) Officer Rubashkin considered a person with posttraumatic stress disorder ("PTSD") to be disabled, just as he would consider a person in a wheelchair to be disabled. (Rubashkin Dep., PageID # 508.) Officer Rubashkin asked the arresting officer whether she would like him to remove Faller from the intoxilyzer room. (Rubashkin Dep., PageID # 489; Def. Statement of Material Facts ("Def. SMF," ECF No. 37), PageID # 867; Pl. SMF, PageID #s 907–08.)

Officer Rubashkin instructed Faller to enter the sallyport with him to begin the booking process. (Faller Dep., PageID # 246.) Faller refused. (Id.) At that point, Officer Rubashkin grabbed her by the arm and escorted her from the intoxilyzer room into the sallyport. (Id., PageID #s 246–47; JSMF, PageID # 100; Rubashkin Dep., PageID # 511.) This was the first time Officer Rubashkin touched Faller. (Faller Dep., PageID # 254; JSMF, PageID # 101.) Two additional male officers accompanied Faller and Officer Rubashkin into the sallyport. (Video Ex. 1, 00:36; JSMF, PageID # 101.) In the sallyport, Faller yelled that she suffered from PTSD and preferred not to be touched by men, and struggled against Officer Rubashkin's grip. (Faller Dep., PageID # 253; Video Ex. 1, 00:34–00:37; Pl. SMF, PageID # 908; Rubashkin Dep., PageID # 512.) Officer Rubashkin decided to take her directly to the secure holding cell for a pat search "due to her level of cooperation." (Rubashkin Dep., PageID # 501.) Officer Rubashkin could have instead elected to wait in the sallyport[3] for a female officer to complete the pat search, but followed normal TBRJ practice in proceeding directly to a secure holding cell. (See id., PageID # 508; Def. SMF, PageID # 869; Pl. SMF, PageID # 910.) For approximately 25 seconds, Officer Rubashkin held

---

[3] Officer Rubashkin's deposition testimony refers to the area he could have waited as the "pat search area." See Rubashkin Dep. (ECF No. 30), PageID # 508. The TBRJ policy's references to pat searches generally taking place in the sallyport, alongside the context of Officer Rubashkin's testimony, suggest that the "pat search area" was the sallyport. See id.; Joint Ex. 6 (ECF No. 27-6), PageID #s 145 & 146.

5

Faller against a padded wall, with her arms restrained behind her back. (Video Ex. 1, 00:38–1:03; JSMF, PageID # 101.)

While holding Faller's arms behind her back,[4] Officer Rubashkin, still accompanied by the other two officers, walked Faller to a secure holding cell. (Video Ex. 2, 00:09–00:14; Video Ex. 3, 00:11–00:20.) A fourth male officer joined Officer Rubashkin and his two fellow officers as they entered the holding cell with Faller. (Video Ex. 4, 01:17.) Officer Rubashkin then positioned Faller to face a padded mattress adjacent to a wall. (Id., 01:18–01:21.) As Officer Rubashkin released his grasp on Faller's arms, she spun around, pointed her finger at Officer Rubashkin's face, and told him not to touch her. (Faller Dep., PageID # 260; JSMF, PageID # 102.) Faller moved backward, away from Officer Rubashkin, and flailed her arms. (Video Ex. 4, 01:21–01:25.) Officer Rubashkin pushed Faller to a seated position on the mattress and restrained her arms in front of her body. (Id., 01:24 – 01:27; JSMF, PageID # 102.)

After releasing Faller's arms, Officer Rubashkin pointed at the wall and instructed Faller to get on her hands and knees on the mattress. (Video Ex. 4, 01:33–01:44; Faller Dep., PageID # 261.) Faller did not comply. (Video Ex. 4, 01:33–01:44; Rubashkin Dep., PageID # 521.) In response, Officer Rubashkin grabbed Faller by the arm, led her atop the mattress, and attempted to force her into a position to be searched. (Video Ex. 4, 01:44–01:51; Def. SMF, PageID # 869; Pl. SMF, PageID # 910.) Two other male officers joined Officer Rubashkin's efforts as he struggled with Faller. (Video Ex. 4, 01:44–01:51.) Instead of facing the wall, Faller twisted herself away and sat on the mattress with the officers holding her arms in front of her body. (Id., 01:49–

---

[4] No handcuffs were used to restrain Faller once she was in TBRJ custody. See Pl. SMF, PageID # 917 & Def. Reply SMF, PageID # 1034.

01:52.) The officers immobilized Faller on the mattress[5] and restrained her there as Officer Naomi Bonang, a female officer, entered the room. (Id., 01:57–02:02.) During Officer Rubashkin's struggles with Faller, several additional male officers approached the room, and some entered. (Id., 01:38–02:35.) One of the additional male officers present was the shift commander on duty, Officer Steven Schutt. (Schutt Dep. (ECF No. 34), PageID # 821.) During her encounter with the male officers, Faller reiterated that she suffered from PTSD and could not "handle aggressive men handling her." (Pl. SMF, PageID # 919; Def. Reply SMF, PageID # 1036.)

Officer Bonang approached Faller and informed her that she would undertake a pat search of Faller's person. (Bonang Dep., PageID # 379; Video Ex. 4, 02:00–02:15; JSMF, PageID # 103.) The male officers continued to restrain Faller for approximately another two minutes using their hands and knees and also removed Faller's shoes while Officer Bonang began her search. (Video Ex. 4, 02:05–04:05; id., 02:43–02:48; JSMF, PageID # 103; Faller Dep., PageID # 263.) Several of the male officers restraining Faller touched her hair, breast, and inner thigh.[6] (Faller Dep., PageID #s 263–64.) Following a request from Officer Bonang, the male officers released Faller and stepped away. (Video Ex. 4, 04:05–04:15; JSMF, PageID # 103.) Officer Bonang completed her search of Faller without assistance. (Video Ex. 4, 04:05–06:58; JSMF, PageID # 103.) After the male officers released Faller and only Officer Bonang was in contact with her, Faller calmed down. (Video Ex. 4, 04:05–06:58; Pl. SMF, PageID # 919; Def. Reply SMF, PageID # 1037.)

After the booking process was complete, Officers Rubashkin and Schutt filed "Resistance/Control Reports" describing their encounter with Faller. Officer Rubashkin recorded

---

[5] The relevant video shows Faller from behind in a seated position, arms apparently restrained in front of her body, before an officer's body obscures the camera's view of her body. See Video Ex. 4, 01:51–02:00.

[6] The Court acknowledges that Defendant disputes this fact. See Pl. SMF, PageID # 919 & Def. Reply SMF, PageID #s 1036–37. However, the Court construes the facts in the light most favorable to Plaintiff's own testimony, as it is required to do in resolving the present Motion.

"Place intoxicated inmate in holding cell" as the reason he used physical force against Faller. (Joint Ex. 3 (ECF No. 27-3), PageID # 113; Pl. SMF, PageID # 921; Def. Reply SMF, PageID # 1037.) In turn, Officer Schutt cited "To secure [and] search inmate" as his reason for using physical force. (Joint Ex. 4 (ECF No. 27-4), PageID # 114; Pl. SMF, PageID # 921; Def. Reply SMF, PageID # 1037.)

Faller later saw a nurse at TBRJ because of back pain she had experienced since her encounter with the officers in the secure holding cell. (Faller Dep., PageID # 274.) Faller was released from TBRJ the next morning. (Id., PageID # 277.) After her release, Faller went to the hospital to seek attention for her back pain and noted the presence of bruises on her body. (Id., PageID #s 279–80.) At the hospital, Faller learned she had broken her coccyx. (Id., PageID # 281.)

### III. DISCUSSION

Plaintiff's Complaint (ECF No. 1) asserts two claims arising out of the just-described booking process: (1) a violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq.*; and (2) a violation of the Rehabilitation Act, 29 U.S.C. § 794.[7] As to both claims, she seeks an award of compensatory damages,[8] attorney's fees and costs, as well as an order that requires Defendant "to develop and provide staff adequate training to ensure that

---

[7] The parties have stipulated that Defendant is subject to the Rehabilitation Act. JSMF, PageID # 104; see also 29 U.S.C. § 794(b). Likewise, there is no dispute that that TBRJ, which is operated by SMJA, is a "public entity" for purposes of Title II of the ADA. See 30-A M.R.S.A. §§ 1801–1955 (creating SMJA) & 42 U.S.C. § 12131(1)(B) (defining "public entity" to include any "other instrumentality of a State or States or local government").

[8] While the parties have not expressly briefed the limits of any compensatory damage award, the Court notes that the Supreme Court recently held that "emotional distress damages are not recoverable" under the Rehabilitation Act. See Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, 1576 (2022). It is likely that this limitation on compensatory damages extends to Plaintiff's ADA claim as well. See 42 U.S.C. § 12133 (limiting remedies under Title II to those available under 29 U.S.C. § 794a); see also, e.g., Gillette v. Oregon., No. 3:20-cv-00513-IM, 2022 WL 2819057, at *7 n.5 (D. Or. July 19, 2022).

individuals with disabilities are not discriminated against and are provided reasonable accommodations for their disabilities."[9] (Compl. (ECF No. 1), PageID # 12.)

### A. Relationship Between the ADA and the Rehabilitation Act

Title II of ADA "prohibits a 'public entity' from discriminating against a 'qualified individual with a disability' on account of that individual's disability." Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 208 (1998) (quoting 42 U.S.C. § 12132). "Because Title II of the ADA is modeled on § 504 of the Rehabilitation Act [a court may] rely interchangeably on decisional law applying § 504" in evaluating a Title II claim. Kiman v. New Hampshire Dep't of Corr., 451 F.3d 274, 285 n.10 (1st Cir. 2006); see also Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). The Court thus analyzes both of Plaintiff's claims of disability discrimination "simultaneously through the rubric of the ADA." Snell, 998 F.3d at 498 (citing Nunes v. Massachusetts Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014)). In ascertaining the requirements of the ADA, regulations promulgated by the Attorney General pursuant to delegated authority under the Act "must be given legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." Parker v. Universidad de P.R., 225 F.3d 1, 5 n.5 (1st Cir. 2000) (quoting United States v. Morton, 467 U.S. 822, 834 (1984) (alteration in original omitted).

### B. Plaintiff's Claims

A plaintiff seeking relief under Title II of the ADA "must [first] establish . . . that [s]he is a qualified individual with a disability." Kiman, 451 F.3d at 283 (quoting Parker, 225 F.3d at 5).

---

[9] It is not apparent on the record presented that Plaintiff has standing to pursue injunctive relief even if she can establish liability on her claims. See, e.g., Gray v. Cummings, 917 F.3d 1, 19 (1st Cir. 2019) (explaining that in the context of Title II "a plaintiff must establish a real and immediate threat resulting in a sufficient likelihood that she will again be wronged in a similar way") (cleaned up).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities[;] (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). Here, the summary judgment record establishes that Plaintiff falls into the third category, as Officer Rubashkin knew of Plaintiff's PTSD and "considered PTSD to be a disability the same way he does if someone uses a wheelchair."[10] (JSMF, PageID # 105; see Rubashkin Dep., PageID # 508.)

A qualified individual with a disability must prove two additional elements to establish a Title II claim: "that [s]he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and . . . that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Kiman, 451 F.3d at 283 (quoting Parker, 225 F.3d at 5). Plaintiff alleges two distinct theories of disability discrimination to satisfy these two elements of a Title II claim: failure to accommodate her disability and disparate treatment.

### 1. Failure-to-Accommodate Claim

Plaintiff asserts that Defendant failed to accommodate her disability in violation of the ADA. Under Title II, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" falls within the statute's definition of "discrimination," satisfying the second element of the Title II test. 42 U.S.C. §§ 12112(b)(5)(A). "[T]he ADA's reasonable accommodation requirement usually does not apply unless triggered by a request." Kiman, 451 F.3d at 283 (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001)). A failure-to-accommodate claim "does not require that an [covered entity's] action be motivated by a discriminatory animus directed at the disability."

---

[10] Additionally, Defendant assumes for purposes of this Motion that "Plaintiff was a qualified individual with a disability." Def. Mot. (ECF No. 36), PageID # 856 n.6.

Higgins v. New Balance Athletic Shoe Co., 194 F.3d 252, 264 (1st Cir. 1999). "Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability.'" Id. The third element of a Title II claim is therefore satisfied if the plaintiff can prove a failure to accommodate her disability, without evidence (direct or indirect) of intent.

A plaintiff alleging failure to accommodate must make a preliminary showing that her proposed accommodation is both effective and reasonable. See Reed, 244 F.3d at 259. Here, Defendant already had a policy and practice of having a female officer conduct pat searches on female admittees. Additionally, the record reflects that Defendant was able to have a female officer in the booking area within five minutes of Faller's request for this accommodation. Also, it appears reasonable that Defendant could permit admittees who are perceived to have a disability like PTSD to wait in the intoxilyzer room or the sallyport for the arrival of a same sex officer to perform a pat search. Moreover, in this case, the record establishes that Faller was cooperative with the female officer once she arrived. Thus, the record establishes a preliminary showing that Faller's requested accommodation of having exclusively a female officer involved in the hands-on aspects of her booking was both effective and reasonable.

Nevertheless, even a facially effective and reasonable proposed accommodation may not be required by the Rehabilitation Act[11] if it "would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). In assessing the reasonableness of a plaintiff's proposed accommodation in a jail setting, the Court must afford due deference to the facility's interest in "maintaining security and order." Snell, 998 F.3d at 501 (quoting Bell v. Wolfish, 441 U.S. 520, 540 n. 23 (1979)). In this case, the record is trialworthy as to this defense.

---

[11] "The regulations under the relevant portion of the ADA refer to 'reasonable modification,' . . . while the coordinating regulations under the Rehabilitation Act use the term 'reasonable accommodation,' but there is no material difference between the terms." Snell, 998 F.3d at 499 n.32 (internal quotation marks omitted) (quoting Nunes, 766 F.3d at 145 n.6).

Defendant has proffered evidence that could allow a factfinder to conclude that Plaintiff's proposed accommodation would have "fundamentally alter[ed]" the booking process at its facility. 28 C.F.R. § 35.130(b)(7)(i). Specifically, while Plaintiff's proposed accommodation may be viewed as "feasible in the run of cases," Reed, 244 F.3d at 259 n.5, Defendant points to Faller's "own behavior" as requiring immediate intervention. (Def. Mot. (ECF No. 36), PageID # 859.) Defendant posits it would fundamentally alter the security of the booking process if officers witnessing uncooperative behavior by a disabled admittee were required to do nothing until the requested accommodation could be in place. A reasonable jury might conclude "under the[se] circumstances" that it would fundamentally alter the nature of the booking process not to allow an officer of the opposite sex to touch an admittee after the admittee became uncooperative. Reed, 244 F.3d at 259. However, a reasonable jury might also conclude that the booking process would not be fundamentally altered by holding a disabled admittee in the intoxilyzer room or sallyport for a short period of time in order to allow for the arrival of the requested same sex officer.

Ultimately, Defendant seeks to frame this case as simply a delayed accommodation for an uncooperative inmate. However, a factfinder who resolves all of the disputed issues of fact in Plaintiff's favor could view differently what happened to Plaintiff from the time she was moved from the intoxilyzer room or sallyport until the time that Officer Bonang began her pat search in earnest. Specifically, a reasonable jury could conclude that the male officers, while aware of Plaintiff's PTSD and her requested accommodation, engaged in unnecessary physical contact with her and in so doing failed to reasonably accommodate her disability and caused her "to suffer greater injury or indignity . . . than other arrestees." Gray, 917 F.3d at 15 (quoting Gohier v. Enright, 186 F.3d 1216, 1220–21 (10th Cir. 1999)).

Thus, the Court readily finds that Plaintiff's claims are trialworthy to the extent they are based on a failure-to-accommodate theory.[12]

### 2.     Disparate Treatment Claim

Relatedly, Plaintiff alleges that she suffered "disparate treatment on account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct." Nunes, 766 F.3d at 144.  In other words, Plaintiff asserts that Defendant "intentionally subjected her to an unnecessarily forceful booking and intake process," causing her "emotional and physical injury." (Compl., PageID # 9; see also Pl. Response (ECF No. 40), PageID # 897 ("Defendant subjected Plaintiff to an unnecessarily abusive intake process[.]").)  If supported by adequate evidence in the record, such a theory straightforwardly satisfies the latter two elements of a Title II claim in that the disparate treatment constitutes discrimination (satisfying the second element), and an intent to discriminate clearly renders resulting discriminatory action "by reason of [the plaintiff's] disability" (satisfying the third element).  Kiman, 451 F.3d at 283 (quoting Parker, 225 F.3d at 5). However, Defendant argues that Plaintiff "cannot establish the 'by reason of' element of a Title II claim." (Def. Mot., PageID # 857.)

"Liability in a disparate-treatment case depends on whether the protected trait actually motivated" the relevant decision-maker's treatment of the plaintiff.  Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (internal quotation marks and alteration omitted).  "[A] plaintiff can prove disparate treatment either (1) by direct evidence [of discriminatory intent], or (2) by using the burden-shifting framework set forth in McDonnell Douglas [Corp. v. Green, 411 U.S. 792

---

[12] To the extent that Defendant has argued that the record establishes a "direct threat" defense that excused it from providing a reasonable accommodation, the Court concludes that genuine issues of material fact prevent entry of summary judgment on that basis.  See 28 C.F.R. § 35.139; see also Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 488 (N.D.N.Y. 2017) (declining to grant summary judgment based on a direct threat affirmative defense).

(1973)]." Young v. United Parcel Serv., Inc., 575 U.S. 206, 213 (2015); see also Nunes, 766 F.3d at 145; Smith v. Aroostook Cnty., 376 F. Supp. 3d 146, 158 (D. Me. 2019).

Here, Plaintiff has not adduced direct evidence of intentional discrimination in the record, which lacks any statements or expressive conduct on the part of any officer suggesting an intent to alter his behavior because of Plaintiff's disability. See Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002) (explaining what qualifies as direct evidence). Accordingly, Plaintiff's disparate treatment claim rises or falls on her ability to raise a triable issue of fact under the McDonnell Douglas framework. Under that framework, a plaintiff must first make out a prima facie case of discrimination. Young, 575 U.S. at 213. "[T]hen[,] the burden shifts to the defendant[] to provide a 'legitimate non-retaliatory explanation for the adverse action.'" Snell, 998 F.3d at 487 (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 42 (1st Cir. 2012)). "If the defendant[] succeed[s], . . . the burden shifts back to [the plaintiff] to establish sufficient facts such that a reasonable juror could believe the defendants' explanations were pretextual[.]" Id.

Here, Plaintiff has presented a prima facie case of discrimination in that she has put forward evidence establishing that Defendant subjected her to physical contact with multiple male officers while awaiting the imminent arrival of a female officer despite being notified of her disability. However, Defendant has also met its burden of proffering a "legitimate non-retaliatory explanation" for this contact. D.B., 675 F.3d at 42. Specifically, Defendant puts forth the justification that maintaining the security of the facility and its occupants necessitated male officers touching Faller given her uncooperative reaction to initial directives. (See Def. Mot., PageID #s 855–63.)

14

Thus, the burden shifts back to Plaintiff to prove this explanation is pretextual. To be clear, the record establishes that TBRJ policy required that its officers not leave an admittee alone prior to being pat searched and also called for an admittee to be taken from the intoxilyzer room into the sallyport for the pat search. From there, uncooperative admittees could be taken directly to a secure holding cell to be pat searched by an officer of the same sex. Thus, if the record established that these were the only actions Faller experienced, the Court would be inclined to conclude that Plaintiff could not meet her burden.

However, Plaintiff has also put forward evidence that after moving her to a holding cell male officers attempted to force her into positions inconsistent with a pat search and touched her hair, breast, and inner thigh after Officer Bonang had arrived. Defendant disputes that the male officers touched Plaintiff at all other than to restrain her arms. (See Pl. SMF, PageID # 919; Def. Reply SMF, PageID # 1037.) But, the Court is obligated at this stage to construe the evidence in the light most favorable to Plaintiff. See Kiman, 451 F.3d at 282. In short, the availability of a female officer, combined with the number of male officers as well as the extent and nature of their physical contact with Plaintiff, could permit a reasonable factfinder to conclude that Defendant's security justification is pretextual.

In sum, Plaintiff has raised a triable issue of intentional discrimination under the ADA and Rehabilitation Act to the extent that she has proffered evidence from which a reasonable jury could find that Defendant's officers engaged in physical contact with Plaintiff that exceeded what was required to restrain her while awaiting the arrival of Officer Bonang and the completion of her pat search.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Summary Judgment (ECF No. 36).

SO ORDERED.

                                                /s/ George Z. Singal
                                                United States District Judge

Dated this 29th day of July, 2022.